May it please the Court. Joseph Klapich for Appellant Palm Wonderful. The issue in this case is whether Palm can stop the sale of a pomegranate beverage called Palm. The District Court held that Palm was not entitled to a preliminary injunction, even though its competitor was using the same word, spelled the same way, P-O-M, pronounced the same way, with the same meaning, to sell a competing pomegranate beverage. The District Court's ruling is wrong as a matter of law, because it misapplies five of the eight Sleecraft factors. It's also wrong as a matter of public policy. If the District Court's analysis is correct, all that a competitor would need to do to get around another company's trademark is simply change the font and the capitalization, and that would do away with trademark law altogether. Mr. Klapich, help me with what for me is the hardest part of the case, the standard of review. It looks to me as though we have case law saying risk of confusion, although there are legal aspects to it, is a finding of fact. If you get clearly erroneous review, well, you can satisfy it. We have a case where somebody did overturn a case on the clearly erroneous, or despite the clearly erroneous standard, I think you cited it. However, it's a lot harder. And if we have abusive discretion review for the whole decision not to grant a preliminary injunction and clearly erroneous review for the risk of confusion, that doesn't really allow us to substitute our own judgment of how to apply the Sleecraft factors. So tell me about standard of review. Certainly. So there are two separate inquiries as part of the standard of review. The first inquiry is, did the trial court apply the correct underlying legal principles? That is reviewed by this court de novo, even under the abusive discretion standard. But the judge found Sleecraft and went through the factors. Right, but the error in the judge's legal analysis is that the sight, sound, and meaning test doesn't exist in a vacuum. It is set up as part of a complex system of legal principles that's designed for two purposes. One, we have different weights that are given to different factors under the case law as a matter of law. And two, we have the situation where this test is designed to approximate what goes through the consumer's mind as they come across these marks in the ordinary course of shopping. Right, and so here are the three, what I'll show identifies the three legal errors, the three. Well, before you get to that, if there are legal, if there are three legal errors and we agree with you, then is there a burden of proof problem about whether we remand for the district court to make the finding in the first place? Or do we decide without those errors how we would decide it? How would the relief be fashioned if we agreed with your three legal errors? This court has two options. The first option would be to determine that the district court applied the wrong legal analysis. It weighed the factors. On three factors. On these three areas. And then it would reverse and remand for the district court to apply the correct legal analysis. Right, that's one approach. Right, that's one approach. The other approach would be the approach that was followed by the Sleetcraft Court itself. And to respond to Judge Kleinfeld's decision, there's not only, and I'll address this later, there's not only one case that finds clear error under these circumstances and reverses. I can give you six. I can give you a bunch of cases. It seems to me that on the factors that are labeled in my notes here, four, seven, and eight, the defendant doesn't actually challenge that there's an error in the way the district court considered those. It simply says that the error was harmless. At least that's how I read it. And that where the court faulted the plaintiff for not bringing in evidence on things like intent and actual confusion, and we have cases that say that those things are either irrelevant or by no means noteworthy and, therefore, it's neutral and it does not favor the defendant. So what do we do with their assertion? This is kind of a standard review question, too. They're saying, okay, the error was harmless. Is that the right inquiry? Well, I think what they have acknowledged is that there was legal error in three, I would say four, intent, actual confusion, expansion, and the marketing channels factor. So four of the eight factors, there's legal error here. Marketing channels is more of a factual question, it seems to me. If I could just briefly address that, it's not, because what the judge held, what the district court held was that the standard under the marketing channels was, are they sold side by side in the same store? And the case law makes abundantly clear that, and sleek crap makes abundantly clear, all you need is a general overlap of the same class of consumers. I didn't understand the marketing channels issue factually. Is this one drink that you can get at Ralph's Grocery and another drink you only get at Albertson's, or one drink you get at Ralph's and the other drink you only get at truck stops and convenience stores? I couldn't follow. It looked to me like two different drinks and at least one, Albertson's I think carried both and some others you got at some other stores, but I couldn't tell what kind of stores. The state of the record is that these products are sold, both sold, to retail customers in the same grocery store chains like Albertson's and in the same geographic markets such as Dallas. And you can see that at Volume 3 of the excerpt of record at pages 372 to 73 and at Volume 2 of the excerpt of record at page 234. So what you have is there wasn't evidence that they were side by side in the same store. So stuff is sold in grocery stores? Exactly. The Pure Palm and my client's palm are sold both in not just the grocery stores, but the same grocery store chain and in the same geographic markets. Let's go back. Judge Kleinfeld talked about burden of proof being an important issue, and I think I agree with him. It is a very important issue in this case. The other fundamental issue that I think is kind of important to make sure we all are on the same page is the kind of mark that you have. My understanding is a standard character mark. Is that correct? The answer to that is correct, but we have both marks. Okay. We own a composite mark for palm with the heart-shaped O. We also own the standard character mark for palm. So let's talk about the standard character mark. That includes all of the design variations. Is that right? That's correct. If you looked at the standard character mark, we would not necessarily conclude there's no infringement because the presentment is different. For example, if I had a standard character mark for the word Ford, it would not be a defense to say, well, you're using Ford in red letters three inches tall and we're using Ford in Italian script because the word Ford. Am I right? I mean, to me, the two big picture issues in this case is burden of proof that was identified and the rights that flow from a standard character mark rather than a design mark. And I agree with you completely. In fact, I'll give you a citation that supports exactly what you've just said, which is Section 1057B of the Lanham Act, which states that when a party obtains a hold, a certificate of registration for a standard word character trademark, as palm has in this case, that gives them, quote, the exclusive right to use that product in connection with the sale. That mark, you mean, or that word? You said that product. I'm sorry. In connection with the goods and services for which it had been registered. So in this case, we were registered under Classes 30 and 32, which include fruit beverages. So any fruit beverage, we have an exclusive right to use this term. And that's exactly to avoid the scenario where somebody comes out with a Ford car that's, you know, that uses a different font. Hey, we own that mark. But they can have a Ford fruit beverage. Maybe. Because it's a different product. I'm sorry. Because it's a different product. Exactly. And that may. But nobody's really arguing that these are not competitive, similar products. Exactly. In fact, the trial court found, as a matter of fact, that they were very closely related beverages. So that when we have a standard character mark, we look not only at the visual, but the audible and the meaning. Right. And that's true of any mark. But particularly true in a standard character mark because it's not limited by its graphic presentation. Exactly. Exactly right, Your Honor. And then one other. I guess I would say those are the two biggie issues in the case. But a third lesser issue to me is whether there is extra weight given to a suggestive mark, that is a mark that suggests the character, like palm, suggesting it's pomegranate, that a suggestive mark may have more power to it than a non-suggestive mark, a made-up word. Is that right or wrong? Well, the courts have found that there's sort of a spectrum of the strength of marks, if you will. And you have generic terms that have very little protection. You then have descriptive terms that also have very little protection. And then you get to things like descriptive, I'm sorry, like suggestive marks like palm. It's not synonymous with pomegranate, but it's suggestive of pomegranate. And so the court found that that is entitled under the case law to a significant degree, a much greater degree of protection than if it were just a descriptive mark. So that to me is the third, not quite as big as the first two, but an important characteristic for us to consider that we might come out differently if it were not a suggestive mark, if it were descriptive or totally fanciful. I'm sorry. If it were a totally fanciful mark or if it were a totally descriptive mark, there arguably would be less protection for palm wonderful than if it is a suggestive mark. I think that's the result. In terms of the first point of whether, just addressing strength of trademark. Sure. Is that right or wrong? What the case law says is that arbitrary and fanciful marks are entitled to the most protection and suggestive marks are entitled to just below that. Okay. All right. Thanks. But certainly both are entitled to more protection than the other types of marks. Are these products both pomegranate juice? Or I had the impression that Palm sells pomegranate juice and Pure sells something that says pomegranate all natural, but it's actually an energy drink, a lot of caffeine and sugar, which is I guess people get energy drinks if they're on a long drive and drowsy and they get pomegranate juice because they think it's good for their heart, something like that? Right. My client sells not just pomegranate juice but also other pomegranate beverages, and there's evidence in the record that we sell, for example, a tea beverage, and we have certain trademarks that are related to the palm tea as well as just plain ingredients, pomegranates, and this particular product is advertised as a pomegranate beverage that is an energy drink. What I'm wondering is whether some person who has health concerns would go in looking for pomegranate juice, imagining or believing that it's good for his health, and think, oh, gee, there's something that's pure pomegranate juice. That'll be even better. Is it that sort of confusion we're talking about, or are these plainly different type of drinks, or are they the same drink? There's several types of confusion that my client is worried about. The first type of confusion is we sell palm beverages. If somebody sees this energy drink, they think it's our beverage because it has the word palm in it. Confusion of source. Right, confusion of source. So you're thinking they get upset because it makes them all jumpy, and they think, I don't want to drink that stuff anymore. Well, or energy drinks, and there's evidence of this that was submitted in the record attached to Mr. Visegi's declaration, but energy drinks have been linked to deaths. People have had heart attacks from having energy drinks. My client – I'm sorry. There is evidence in the record on that? That was – I mean, I know that argument was made in the briefs, but there are specific records. Yes, if you look at Mr. Visegi's declaration to the – his declaration in support of the motion for the preliminary injunction, he attaches newspaper articles that talk about the dangers posed by energy drinks, and since my client has built its brand on being healthy products, the kind of products that you would give to your children, the risk that's presented here is that here's somebody who grabs this energy drink, has serious, you know, health issues related to it, and there's confusion. That's, hey, that energy drink belonged to Palm. We thought Palm was healthy, and now there's energy drinks. So I can see why that factor would come into the fore test of whether you get a preliminary injunction or not. Exactly. But that factor then says, yeah, my client's really going to be hurt. That's not a sleek craft factor. That is an injunctive factor. That is – that goes to the irreparable harm. If I could, before I run out of time, I'd really love to get back to what I see as the three legal errors in the district court's analysis that require reversal. The first legal error is the district court conducted a side-by-side comparison of the two products and the two marks, and that was a legal error because that's not the way that consumers experience these trademarks in the market. They're not side-by-side on the shelf next to each other. You see one trademark or you hear about one trademark, you have an idea about Palm, right, and then you go into the store and you see the other trademark sometime later. And so we can't do a side-by-side comparison like the district court did where she's nitpicking about font  What are the other two? You are out of time, but I want to hear your thoughts. Sure. The other two legal errors that the district court made was first – or I should say second. Then what the district court focused on was the visual appearance of these two marks. When the case law makes very clear you have to look at the dominant portion of the mark. Why do we look at the dominant portion of the mark? Because that's the part that sticks in the consumer's head. When I'm walking down the aisle looking for Palm, I'm not thinking capital P, heart O, capital M, sans serif 12 font. I'm thinking of the word Palm because that's the way that this trademark is read. That's the way the trademark is spoken. That's the way the trademark is heard. And the third issue? And the third legal issue that the district court made an error of is the district court did not weigh the similarities with greater weight than the differences. The way that the case law is set up is that because we can't make a side-by-side comparison, we're trying to put ourselves in the shoes of a consumer who is experiencing this mark. When I'm walking down the aisle and I'm thinking about getting Palm, I don't remember what the font size is for Palm. I don't remember that it uses a heart for the O. All I remember is the word Palm. So when I see this Palm and I see the dominant portion of this mark that's being used here, the correct legal analysis is to take that dominant portion and give greater emphasis to that dominant portion of the mark. Thank you, counsel. You've exceeded your time. Okay. Thank you. That will give you a minute for rebuttal when the time comes. Ms. McCloskey, we'll hear next from you. Good morning. May it please the Court. My name is Heather McCloskey, and I represent the appellee, Robert Hubbard, DBA Pure Beverages. I think before I address the substantive points that were made, I wanted to first take your attention to the excerpts of record, page 238. It is the entire label of the Pure Beverages product at issue. It is a caffeine-free, all-natural product, does not present health risks of any type. It is not in the same category of products as the five-hour energy type of. But it's in the same category as the beverages sold by the plaintiff. And we don't. It is in the category of beverages, and it is pomegranate flavored. However, the risk of health issues. So what you're saying is it's not like Red Bull, have too many of them. Correct. It may not be good for you. Correct. It doesn't pose any health risks. So someone picking up our product. Okay. That gets to the public interest. That's right. I just wanted to clarify that. You're saying quite exactly what you said. You're saying your product, this product that's being challenged of yours, has no stimulative additives. That's correct. Okay. Let me get to this visual. When I look at the pictures in the record, they really look different. When I go to the drive-through at a fast food place and I ask for a cheeseburger and a Coke, and they say, do you mind if it's Pepsi, none of us are looking at the bottles. The other day I went to the grocery, it was a different grocery from the one I usually go to, and I asked the clerk, where do you have such and such? And it was just a word. I don't really see why we should just look at the bottles side by side and say, oh, they look different, when there are just different ways consumers buy these things. Sometimes by saying, that's not the stuff I usually buy, and when they look at it, and sometimes asking somebody where it is or just asking somebody to grab it off the shelf for them or telling their spouse, hey, while you're there, could you get such and such, I don't see why you wouldn't have to look at them all. I agree with what I think you're saying, which is, if we go back to Sleepcraft and we talk about the whole point of the test for similarity, what we're looking at is how they are encountered in the marketplace, which is, you gave three examples of that. Well, I ask for it over the intercom at the drive-thru window, I look for it in the grocery store, I ask someone to find it for me or point it out to me. Well, we have to look at how these particular products are actually confronted in the marketplace. I don't see how that helps you. If someone says, I want POM, then the grocer would hand them the plaintiff's product or the defendant's product. That's not right. And, you know, there are pictures in the record of many products that contain pomegranate juice, and yours is the only one that uses POM other than the plaintiff's many uses of it. And I know that there wasn't evidence about intent, but what other point could there be to use POM other than to sow confusion with POM's products? And I think what you're asking is a different question. Let me answer your question quickly, and then I'll go back to the other one. The reason for using POM on the pure beverages label is to denote that it is pomegranate flavored. It says pomegranate as a whole word, and all the other beverages say pomegranate juice or pomegranate citrus or pomegranate and orange or whatever they are. Nobody is challenging your right to say that you're using pomegranate juice. It is used in this case as a description of what's inside the bottle. Not very descriptive. Well, POM is short for pomegranate. Actually, until I read this case, POM, the first thing I thought of was pom-pom, the thing cheerleaders use. So you're aware one is not an infringing use. Possibly. Those would be energy drinks, probably. I would think that would be appropriate, yes. Another flavor of the pure beverages line. I mean, the description is pomegranate. It's not POM. POM is a special name that this company decided to make up. Except that it is simply abbreviated. The law has a category for that sort of thing, a name that isn't really the English word. Except that it is both in the court. POM isn't the English word for pomegranate. No, it's not, but it is an abbreviation for pomegranate. And in popular culture these days, it's used as an abbreviation for pomegranate. Another flavor. If you look at dictionaries, though, at least, there's no indication that that was a recognized abbreviation before POM came along. Is that right? That is true, and that is an issue that we dealt with before the district court. One of the other flavors of the line of products that we're looking at here by pure beverages is Raz. Raz? Raz. Like for raspberry? Exactly. Well, if they had R-A-Z as a standard character mark, you'd have a problem there, too. I understand that position. I have never until this moment heard anyone call raspberry Raz. I had to think for a moment to think what you were talking about. You may not be familiar with the favorite bubble gum and candy flavors of 6- and 7-year-olds. I thought you were Raz the hitter when you were rooting for the other team. True, true. In popular culture these days, however, Raz, POM, we would argue, are very commonly used. Strawberry. So are you saying it was surrendered to the public domain? But that would attack the mark itself, which I don't think you were doing. No, I'm not. So you're not saying it's like Xerox that became surrendered. No. So that argument really is a little bit misdirected. It's somewhere in the middle of the spectrum, entitled to less protection than the fanciful mark, but certainly not to that degree. Going back to the – Incidentally, is there a dictionary definition in here that says POM is an abbreviation for pomegranate? No. We were not able to find one. Okay. I just forgot my question. Go ahead. I wanted to go back to why you look at how the products are encountered in the marketplace and the three examples that you gave, which I think very well illustrate exactly what we're dealing with in this situation. Our product is not sold through a drive-through window at a fast food restaurant. It's sold in grocery stores. It's sold in grocery stores. And so is POM. So is POM. Anyone going to the grocery store and looking for their product or our product is going to see the label of the product. So you're saying that we only should look at the visual and not the audible. No. I'm not saying that you should only look at that. All right. Because the case law would be contrary to you if that was your argument. That's correct. But that's not what I'm arguing. What I'm saying is, in this case, the court looked at all three. The court focused on the visual because of the particular manner in which these products converge in the marketplace. Except that. We agree that they do. And so that's the one that's relevant. Are you challenging that there's a standard character mark? That's interesting because we're not challenging that there's a standard character mark. However, I can't quite follow POM's argument in that regard. Well, let me just ask you my question then. Let's go back to Judge Ebell's question about Ford, and it's attached to an automobile. So we're dealing with like things. The fact that Ford uses a certain type of script, if you sold another Ford automobile where you used bold letters and put funny little marks above and below each of the letters, wouldn't that still infringe Ford's standard character mark? I think it's a yes or no question. Can you avoid the character mark by sticking a little mark above it? You cannot. You absolutely cannot. Okay. In your scenario, it is correct. You cannot avoid that. Our scenario is different. Well, I don't know. Maybe you think it is, but the fact that you put a little, I don't even know what that's called, a little half circle above. Reve, but it took me a while to figure that out. And smaller letters. That's not going to do it for a character mark. I don't see why it's different, actually. I can see where if I'm a weekly palm buyer, I'm going to not even look at the word anymore. I'm just going to recognize the bottle and the color and the shape. I'm just going to recognize and grab it, throw it in the cart. On the other hand, if I'm visiting my grandchildren and my daughter-in-law says, I'm going to the grocery, anything you want me to pick up? And I say, oh, yeah, I like palm. And she's never bought it before. She's not going to know anything about the shapes of the bottles. All she's going to know is one is palm and one is pure palm. Well, I'll get the pure stuff. It must be healthier. And my response to that? So there, the shapes and the heart don't help you a bit. And what's more, a lot of products come in all different shapes and sizes. Like you go for Coca-Cola, they have it in different shaped bottles. They no longer use their traditional hourglass bottle much. Different shapes. They have cans. They have gigantic, ugly bottles. All kinds of containers. 64-ounce bottles. So all you know is this person for some reason says they like Coke and they don't like Pepsi or something like that. That's why the court, I think, in this situation ended up focusing on the visual, what the consumers contracted. But why do that? Because sometimes people get stuff. I mean, gosh, my guess is it's really typical. When my kids were little, I did all the grocery shopping and I did it for a list. I don't know what my wife wants. I just followed the list. And the visual didn't mean anything. Visual is really controlling for some people with some kinds of shopping and irrelevant for other people doing other kinds of shopping. And I don't understand how you can make the case standard fall on it. In this situation, because there were such distinct visual differences, the court weighed them heavily. That does not mean the court did not weigh the similarities and it does not mean that the court did not consider. You say the court weighed them heavily, but, in fact, the case law says you've got to weigh the similarities more heavily than the differences. True. The court looked at sight, sound. Did the court ever say, I am weighing the similarities, I've looked at the similarities and I've looked at the differences and I'm weighing the similarities more heavily. That trumps the differences. Did the court ever say that? The court did not say that. The court simply, because the court did weigh the differences heavily, did not say more heavily than the similarities, did weigh the differences heavily, the court varied with excruciating detail, laid out the differences that the court felt were determinative in this case. And the court obviously anticipated that it would have to back up its position. What about your first-time buyer? Read an article in the New York Times or Wall Street Journal, one of those health columns about how pomegranate juice is good for you. So they go for, and they imagined, as you told us, that POM is now the cool abbreviation for pomegranate juice. So they go to the grocery for some POM. They don't know which shape is the good POM. Except that any consumer is going to be able to see the difference between a pure juice beverage and an energy drink, a soda with particular flavor, something of that sort. They're in different sections of the supermarket. The print is really fine where it says pure juice beverage as opposed to pomegranate juice. And if you look at a 7-Eleven or something, you don't necessarily put those in different sections. I mean, in small stores they could be put together. Well, you're assuming that the consumer, there are hundreds of beverages available to a consumer when they walk into a 7-Eleven. You're assuming that a consumer is not going to, is just going to say, oh, something pomegranate. It says POM on it, pomegranate flavor. That must be good for me. It must be juice. But I would argue that, in fact, the consumer is going to be more discerning than that. Well, that's the other point. Why would the consumer be more discerning when the price is so small? I mean, that's one of the factors to consider in the sleek craft. Comparatively, the prices are very different. Well, it's different, but it's not like buying a new car where you could expect the consumer to get beyond the initial trademark impressions. You know, you're going to buy a much more impulsive buy when you're buying a juice or drink. Yes, it's a much more impulsive buy, but in any beverage that you're purchasing, you're going to notice the difference between a $4 to $5 drink and a $1 to $2 drink and wonder why you're paying $4 to $5 for a small packaged beverage. You have to look at the relevant marketplace. And in the relevant marketplace, yes, we're not talking about buying a car and buying a soda. There's obviously a huge difference there. What we're talking about is in the realm of beverages. Is there going to be a difference? You can buy sunglasses for $5 at the gas station. You can buy sunglasses at Sunglass Hut for $700. You can't call any of them Maui Jim except for the real Maui Jim, right? That is true. I don't know if that's really a good comparison. I mean, some people, groceries are not a big part of their cost of living, and they shop at Whole Foods. Other people, groceries are a big part of their cost of living, and they shop at Walmart. Once they're at Whole Foods, they may just use price as a shorthand for quality, and the fact that it's $5 rather than $2 is a good reason to grab that one. But still, the grocery shopping is something they do on the way home from work. It's not like buying a car where you read all the reviews and you go out specially on Saturday to look at the car lot. I can certainly understand. I think that's what Judge Ebell was referring to in the law about cheap products getting less examination by the consumer. And I can understand that argument, but at that point what you're doing is you are substituting your own judgment for the court's, and the district court has the discretion to weigh the evidence and weigh the factors. If it did it right. I'm sorry? If it did it right, if it followed Sleecraft. If it properly applied. If it applied the proper standards, yes. But as far as how to weigh those factors and how to interpret the evidence. Counsel, in that regard, did you agree with what I said about you're essentially admitting that three of the factors should not have been weighed against the probability of plaintiff's success on the merits, and that you're just arguing that that error was harmless? Is that? Yes, I do agree with that. So the district court did make at least that legal error. Except that the district court has the discretion to even just choose one Sleecraft factor. But it doesn't have the discretion to do them wrong, and if our case law says that a factor is neutral at best or is unimportant if there's no evidence on it, and if the district court put a lot of weight on that, why isn't that a legal error? That just skews the whole weighing process. In this situation, the district court didn't put a lot of weight on that. In this situation, the district court put its primary weight on the visual. And if that was error, then we're really off to the races. Well, since that was undeniably the primary basis for the ruling. But it also did put weight on the numerosity thing. It did talk about the number of Sleecraft factors that went one way and the other, so it wasn't irrelevant to the court. But the court does have the discretion to even choose one Sleecraft factor and make the determination based on that. That's correct. I know the time is short. May I ask one last question? Certainly. This comes to us, I think, with no discovery at all. Is that right? That's correct. So the questions that the court held against Palm, like the scienter, the intent to infringe and so forth, that they held against Palm, that was in the context of a situation where Palm never had the ability to discover whether there was that intent out there or not. Is that right? That is correct. And that is, in fact, the reason that it is such a deferential standard of review at the preliminary injunction stage. We have an incomplete record. But for the court to say, we're going to rule against you because you haven't proven intent, but, oh, by the way, we're making this ruling before we give you the right to discover intent, it just doesn't seem to be something right about that. It does not seem that that is actually what the court based its ruling on. All right. If the court had said that, I would agree with you. But it does not appear that that is what the court based its ruling on in this case. Well, the court said no intent is one of the factors I'm ruling against you on, in any event. Whether or not that would have made a difference, you would have to look at the fact that it is not unusual at the preliminary injunction stage for a district court to deny a preliminary injunction based solely on differences in labeling, differences in packaging. I know that Palm argued that the case law we cited in support of that dealt primarily with trade dress cases. However, Palm itself relied on the Koss Pharmaceuticals case, which is a trademark infringement case where the question for the court at the preliminary injunction stage came down to whether the labels create the same overall impression. Well, in this situation, the district court found that they did not. Thank you, counsel. Thank you. Mr. Clapin, you used your time, but the opposing counsel went over, so you can have a little rebuttal time as well. I just want to make three very brief points. First of all, Peer's counsel says you have to look at the labels, and I just want to highlight that is absolutely the wrong legal analysis. When you look at the labels, that's a trade dress inquiry. We are comparing the features of the labels. Here we're talking about a trademark inquiry where you're comparing the marks, not the labels. The second point I wanted to make, they had mentioned the idea that Palm was somehow a flavor indicator rather than the name of the product, and that's not the case because if you look at page 425 of the Excerpt of Records, Volume 3, the other products that they have are entitled things like Renew and Revolution, which can't be construed in any fashion as being flavor designators. Well, there are also photos of other brands that just say pomegranate, lime, or things like that, where they use the whole word pomegranate. Right, and there's no objection to the use of the word pomegranate. It's the palm that's at issue here, the trademark. And then the last point I wanted to make is I wanted to make good on my promise. I mentioned that there were many, many cases that have found, even under the clearly erroneous standard, that reversed findings of dissimilarity. And the first one we've talked about a lot is the Sleek Craft decision itself. In Sleek Craft, the district court made the finding that Sleek Craft and Slick Craft were dissimilar. The Ninth Circuit reversed, saying that it was clearly erroneous. And then there are three cases that are discussed in Sleek Craft. Did the Ninth Circuit reverse and remand for further considerations, or did the Ninth Circuit at that point in Sleek Craft just say, we're going to conclude that there's a violation? The Ninth Circuit in Sleek Craft actually ordered a preliminary injunction to be granted. So it made its own decision. So it made its own decision. And, in fact, in all the cases that I'll give you right now, the appellate courts did exactly that, and we would submit that that's the appropriate relief here. There are three cases that are discussed in Sleek Craft. One is the ComSat decision, C-O-M-C-E-T, at 429 F-second 1249. And in that case, there was a reversal for clear error of a finding of dissimilarity of ComSat, C-O-M-C-E-T, versus ComSat, C-O-M-S-A-T. In the Polaroid case, which is 319 F-second at 830, it was Polaroid versus PolarAid, P-O-L-A-R-A-I-D. That was reversed for clear error. In the J.D. Sarrell case, which is 265 F-second at 385, it was Dramamine versus Bonamine, reversed for clear error. In the Beer Nuts case, which is 805 F-second, 920, cited in our brief, Beer Nuts versus Brew Nuts, reversed for clear error. In the More Business Forms case, 960 F-second, 486, it was CompuWrite versus CompuWrite with a capital R and a different stylization, reversed for clear error. And then in the Fuji Photo case, 754 F-second, 591, it was Fuji and Fuji, except for the other Fuji was at a slanted and in a different font. That was reversed for clear error. Can we still do that now that the law is that an injunction isn't presumed? I recall we used to have law that a preliminary injunction was presumed and almost always required. Right. I think you're referring to the Reid case that came out last, I want to say in December, that said you can no longer presume irreparable harm. I think the evidence that was presented here of irreparable harm was at least three different points I'll make on that. One, you have an energy drink product that is a dangerous product, and I know we have counsel's representation that's perfectly healthy, but I don't think my client is forced to rely on that. Let me just add, in Sleekcraft, and again, I'm doing this from memory, so I may be mistaken. We held that there was error, clear error, and that an injunction should have issued, but we left the specifics of the injunction to the district court on remand to fashion the appropriate scope. Is that what you're talking about here? I think you can go further and order just a plain injunction. The facts of Sleekcraft were a little unusual. Well, am I right about what we did there? Yes, but because the facts were slightly unusual, what happened in the Sleekcraft decision itself is that the infringing mark had dramatically altered its mark after the litigation had begun, and so there was some lesser risk of confusion, and so it was sort of sent back to the district court to make a decision as to exactly what the appropriate. Okay, and you're saying here it's palm and palm. Palm and palm. It's a standard character word mark. I don't think that we need to send it back for any kind of analysis other than a preliminary injunction should issue. Thank you, counsel. Thank you, Your Honor. The case just argued is submitted. We appreciate very much the helpful arguments of both counsel in this very interesting case, and we're adjourned for this morning's session.
judges: Ebel, Kleinfeld, Graber